Alan **GRECCO**, Petitioner,

v.

Edward **O'LONE**, etc., et al., Respondents.

Civ. No. 84–4908 (AET).

United States District Court, D. New Jersey.

May 27, 1987.

Clapp & Eisenberg by Salvatore T. Alfano, Newark, N.J., for petitioner.

Richard T. Carley, Dist. Atty. Gen., Div. of Crim. Justice, Richard J. Hughes Justice Complex, Trenton, N.J., for respondents.

## ON PETITION FOR WRIT OF HABEAS CORPUS

ANNE E. THOMPSON, District Judge.

This cause comes before the court upon a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Alan Grecco. The petitioner has raised four issues in his petition. He contends that the trial judge erred in refusing to instruct the jury on the issue of entrapment as requested by the petitioner and that the trial court's supplemental instruction denied the petitioner a fair trial. The petitioner additionally claims that by allowing the introduction of statements by a non-testifying co-conspirator the trial judge violated his Sixth Amendment right to confrontation and that the sentence imposed upon him by the judge was unconscionable.

The court has fully considered and disposed of each distinct and separate point raised by the petitioner. *See Flowers v. Blackburn*, 759 F.2d 1194 (5th Cir.1985). After reviewing the entire record and pleadings in this case the court finds that the points raised by the petitioner are resolved against him or fail to state a claim under federal habeas corpus law.

An eight count indictment was returned on April 13, 1982, charging Donald Conway, Vincent Rigolosi, Samuel Lazzara, Joseph Lazaro and the petitioner with conspiracy and other substantive violations. Unindicted co-conspirator Joseph Barcelona was also named in the indictment.[1] After a seven week trial, in the New Jersey Superior Court, Law Division, the jury (i) acquitted Messrs. Rigolosi and Lazaro; (ii) found Mr. Conway guilty of conspiracy (N.J.S.A. 2C:5-2) and tampering with a witness (N.J.S.A. 2C:28-5(a)(1) and N.J.S.A. 2C:2-6); and (iii) found Grecco, the petitioner, guilty of conspiracy (N.J.S.A. 2C:5-2) and bribery (N.J.S.A. 2C:27-2(c) and N.J. S.A. 2C:2-6).

The court suspended Mr. Conway's sentence. With respect to the petitioner, the court merged the conspiracy and bribery counts and imposed a seven year term in State Prison. A $1500 fine and $25 Violent Crimes Compensation Board penalty were also imposed.

The petitioner appealed the conviction to the Appellate Division which consolidated the petitioner's appeal with Mr. Conway's appeal and affirmed the conviction. *State v. Conway*, 193 N.J.Super. 133, 472 A.2d 588 (App.Div.1984). The Supreme Court of New Jersey denied a petition for certification. *State v. Grecco*, 97 N.J. 651, 483 A.2d 174 (1984).

## STATEMENT OF FACTS

Prior to outlining those portions of the record which are pertinent to this petition, the court shall refer to the more expansive record set out by the court in *State v. Conway*, 193 N.J.Super. 133, 472 A.2d 588 (App.Div.1984).

This case originated out of an altercation on July 19, 1981, between Philip Lombardo, Jr. and State Police Officer McDowell outside a club owned by Joseph Barcellona. *Conway*, 193 N.J.Super. at 140, 472 A.2d 588. On the day of the altercation, Donald Conway was retained to represent Lombardo. *Id.*, at 141, 472 A.2d 588.

On July 24, McDowell, equipped with a recording device, went to Barcellona's club where he spoke to Joseph Lazaro, a sergeant in the New Jersey State Police and a cousin of Barcellona. *Id.* Lazaro told McDowell that Barcellona had attended a meeting with the attorneys in the case and Alan Grecco. Lazaro informed McDowell that Lombardo's father was high up in the Vito Genovese family and that Grecco had offered $10,000 for McDowell to get rid of the charges against Lombardo. McDowell, assuming the role of a corrupt officer, acted interested in the bribe and stated that his report could be altered.

Barcellona later joined this conversation and said that he had advised Grecco and

1. On the same date, a separate indictment was returned against Joseph Barcellona charging him with the same crimes.

the others that he would approach McDowell through Lazaro. During the course of the meeting, Lazaro arranged by telephone with his uncle, Sam Lazzara, to have Grecco contact him.

Later that evening Lazaro received a call from Grecco who instructed Lazaro to meet him at Lazzara's home and not to bring McDowell. McDowell suggested that Lazaro advise Grecco that a report with loopholes could be written.

On July 25, Lazaro met with Grecco at Lazzara's home. They discussed alternatives which could be used to prevent Lombardo's conviction, such as altering the report or having McDowell fail to identify Lombardo in a line-up. Lazaro told Grecco that he had talked to Barcellona and asked what it was worth. Grecco replied it was worth $10,000. Lazaro told Grecco he would discuss the matter with McDowell. Grecco later returned to Lazzara's home and gave Lazzara money that he was to pass on to Lazaro. Lazaro then returned to Lazzara's home where he received $5,000 from Lazzara, who said that the money was from Grecco.

Later that same evening, McDowell met with Lazaro at Barcellona's club. Lazaro gave McDowell the $5,000 and related the details of the meeting with Grecco.

On July 29, Barcellona told Lazaro that he had met with Grecco at a restaurant and had discussed the payment of the $5,000, as well as Lazaro's assurance to Grecco that McDowell would alter the police report. That evening McDowell met Barcellona and have him the original report and the altered report he had made. Barcellona indicated that Grecco and others wanted to see both reports.

On August 16, Lazaro was confronted by superior officers of the New Jersey State Police with the taped conversations McDowell had made. At this point, Lazaro agreed to assist in the investigation. As a result, on August 19 a meeting was held between Lazaro, Conway, Barcellona and others, during which conversations were held concerning the details of the plan to prevent Lombardo's conviction.

During the August 19 meeting, Conway acknowledged to Lazaro that Lombardo's father had been shown the reports by Grecco.

On August 20 or 21, Barcellona advised Lazaro that there was another witness to McDowell's arrest of Lombardo. As a result, on August 24, Lazaro called Lazzara and arranged for Grecco to call. That same evening, Lazaro received and recorded a telephone call from Grecco. During the conversation, Lazaro asked Grecco the identity of the witness and where he had obtained the information. Lazaro advised Grecco that he could arrange for a line-up in which McDowell would not identify Lombardo.

On October 15, Lazaro, again wearing a recording device, met with Grecco at Lazzara's home. During the conversation, Lazaro advised Grecco that McDowell was a "little shakey," and Grecco stated that he understood the nervousness. Lazaro explained that McDowell was aware that Conway originally thought the identification was a good way to go but later said that "we'll go another way." Grecco responded that Conway knew best. Later in the conversation, after Lazaro mentioned that McDowell had not heard from anyone, Grecco said that if McDowell "has to go for a line-up, he knows what to do." The conversation ended with Grecco stating that he hoped it worked out all right.

On October 20, Lazaro advised Barcellona that the Lombardo case had been dismissed and requested arrangements for collecting the second half of the pay-off.

On October 21, Lazaro again spoke by telephone with Barcellona and recorded the conversation. During the conversation, Barcellona advised Lazaro that he had obtained the other $5,000.

On October 22, Lazaro met with Barcellona and recorded the conversation. He was given an envelope by Barcellona which contained the additional $5,000. Barcellona told Lazaro that he had met with Grecco, that he had told Grecco the case was dismissed and that Grecco replied that he knew. Barcellona informed Lazaro that when Grecco gave him the money, he stat-

ed that it was "ten now." Barcellona said that he had replied that it all went to McDowell.

As a result of the foregoing, Grecco, Conway, Lazzaro, Rigolosi, Barcellona were arrested and subsequently charged as indicated above.

## DISCUSSION

The petitioner contends that the trial judge incorrectly instructed the jury as to the defense of entrapment, thereby depriving the defendant of his constitutional right to a fair trial.

Mr. Grecco had requested the judge to instruct the jury that a defendant does not have to prove entrapment. Contrary to Mr. Grecco's request, the judge charged the jury that if they were satisfied the State had proved the offense charged beyond a reasonable doubt, then the defendant had the burden of proving entrapment by a preponderance of the evidence, pursuant to N.J.S.A. 2C:2–12(b).

■ Questions concerning instructions are normally matters of state law and are not cognizable in federal habeas corpus review. *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977); *Chance v. Garrison,* 537 F.2d 1212 (4th Cir.1976); *Manning v. Rose,* 507 F.2d 889 (6th Cir.1974); *Jacks v. Duckworth,* 486 F.Supp. 1366 (N.D.Ind.1980). Only where the giving of an instruction is so prejudicial as to amount to a violation of due process and fundamental fairness will a habeas corpus claim lie. 28 U.S.C. § 2254(a); *Henderson v. Kibbe, supra; Jacks v. Duckworth,* supra.

In this case the procedure employed by the court in framing and delivering the charge and the substantive charge itself were not a violation of either due process or fundamental fairness and as such did not deprive the petitioner of his constitutional right to a fair trial.

■ Even when an erroneous instruction is given, habeas corpus relief can be granted only if the error goes beyond ordinary trial error to egregious misconduct which is of constitutional magnitude. *Spratlin v.*

*Solem,* 577 F.2d 56 (8th Cir.1978); *United States ex rel. Perry v. Mulligan,* 544 F.2d 674 (3rd Cir.1976), *cert. denied* 430 U.S. 972, 97 S.Ct. 1659, 52 L.Ed.2d 365 (1977). However, the jury instructions given in this case were not improper.

■ Rather, the substance of the charge fairly represented N.J.S.A. 2C:2–12(b) which provides:

Except as provided in subsection c. of this section, a person prosecuted for an offense shall be acquitted if he proves by a preponderance of evidence that his conduct occurred in response to an entrapment. The issue of entrapment shall be tried by the trier of fact.

N.J.S.A. 2C:2–12 has superseded the prior law with respect to entrapment with a single statutory defense, and thus a defendant must establish the defense of entrapment by a preponderance of evidence to be acquitted on that basis. *State v. Medina,* 201 N.J.Super. 565, 493 A.2d 623 (App.Div.1985); *State v. Rockholt,* 96 N.J. 570, 476 A.2d 1236 (1984).

It has been held that this provision of the New Jersey Code of Criminal Justice, which imposes upon the defendant the burden of proving entrapment by a preponderance of the evidence is constitutionally sound. *State v. Rockholt,* 186 N.J.Super. 539, 546, 453 A.2d 258 (App.Div.1982), affirmed 96 N.J. 570, 476 A.2d 1236 (1984). Therefore, the jury charge as set out by Judge Huber was a proper representation of New Jersey law. As such, we see no error in this charge.

■ While a defendant has a right to have a trial judge instruct a jury on his theory of the case when it is supported by the law and evidence, there is no right to have the instructions phrased in the precise terms requested by the defendant. *United States v. Tsinnijinnie,* 601 F.2d 1035 (9th Cir. 1979), *cert. denied* 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980).

■ The failure to use the instructions tendered by the petitioner do not deprive him of a fair trial where the instructions do correctly summarize state law. *Moore v.*

*Duckworth*, 579 F.Supp. 1431 (N.D.Ind. 1984).

The petitioner sought the benefit of a renunciation of criminal purpose charge by asserting that the jury should be charged as to abandonment. The petitioner requested that the jury be instructed that entrapment is a defense when a defendant, although having made the initial criminal overture, abandons his criminal intent and is lured into the criminal conduct which he initially proposed by the overzealous tactics of law enforcement officials.

Petitioner relies on *United States v. Klosterman*, 248 F.2d 191 (3rd Cir.1957), in which the court found that the impetus for the crime, both the intent and the design, originated with the government. With that finding the court reversed the conviction. The *Klosterman* analysis is similar to *State v. Talbot*, 71 N.J. 160, 364 A.2d 9 (1976), in which the court found egregious police conduct which violated due process. In *Talbot*, the state denied fundamental fairness and entrapped the defendant through a state agent supplying the defendant with narcotics for the purpose of having him sell the narcotics to another agent. This entrapment was held to be of a constitutional due process nature and thus was found to exist independently of N.J.S.A. 2C:2–12. The record reveals no motion by the defense counsel at the close of the case asserting due process entrapment. However, even when a due process defense of entrapment is raised, the burden of proof remains with the defendant. *State v. Medina*, 201 N.J.Super. 565, 493 A.2d 623 (App.Div.1985).

The petitioner seeks the benefit of a renunciation of criminal purpose charge by his assertion that the jury should be charged as to abandonment. N.J.S.A. 2C:5–1(d) and 2C:5–2(e).

However, this affirmative defense requires more than mere abandonment of criminal purpose. It is necessary that the conspirator inform the authorities of the conspiracy and thwart the furtherance of the conspiracy. New Jersey law recognizes no affirmative defense of abandonment other than that contained in the stat-utes addressing renunciation of criminal purpose.

The petitioner did not ask for such a charge, nor should one have been given. Thus, the petitioner received an accurate and fair charge as to entrapment and was entitled to nothing more.

The defendant further contends that the procedure used by the trial judge in framing and delivering the recharge deprived the defendant of his constitutional right to a fair trial.

The supplemental charge was given in response to a jury question which indicated a need for additional instructions on each of the substantive counts. The judge, in his five-hour recharge, outlined the factual allegations of the state, the defendant's denial of these facts and charged again the elements of the offenses and the defense of entrapment.

The petitioner claims he was prejudiced by the length and complexity of the recharge.

When a jury requests clarification, the judge is obligated to clear away the confusion. *United States v. McCall*, 592 F.2d 1066, 1068 (9th Cir.1979). The length and magnitude of the charge is not enough for an assertion of prejudice. *Lacaze v. United States*, 391 F.2d 516, 521 (5th Cir. 1968). In fact, in complex cases extended instructions may be necessary. *United States v. Crosby*, 294 F.2d 928, 943 (2d Cir.1961).

The petitioner's case involved three co-defendants, lasted more than seven weeks and involved the introduction of numerous tape recordings. Therefore, it is to be expected that lengthy instructions would need be given.

The supplemental charge occurred in response to a jury question which indicated that the jury needed additional instruction on each of the substantive counts. It is clear the jurors had become confused about how the law, as explained to them by the judge, was to be applied to the testimony of the case and needed additional instruction before continuing their deliberations.

Judge Huber attempted to clear away this confusion by restating the instructions he had given in terms more accessible to the jury. He undertook to translate what had been a more formal and legalistic charge into a charge which used examples to demonstrate the legal principles. He did this in terms of the contentions of both the State and the defendants. He restated the facts established at the trial and how these facts could be related to the law in this case. This allowed the jurors to return to their deliberations in a more focused manner. It is understandable that this effort took time. The supplemental charge about which the petitioner complains neither contradicted itself nor the prior instructions given in the case. Rather, it merely clarified the issues in the case and the law to be applied. It highlighted nothing which worked to the petitioner's prejudice. In fact, the supplemental charge included a review of the entrapment charge.

All of these actions on the part of the trial judge helped to remedy the juror's confusion. As such, we find there was no error.

■ The petitioner asserts that the introduction of Joseph Barcellona's statements violated his Sixth Amendment right to confrontation, thereby depriving him of a fair trial. The petitioner claims the State failed to meet its burden by not demonstrating the unavailability of Mr. Barcellona prior to the introduction of the taped conversations. He relies upon *United States v. Inadi*, 748 F.2d 812 (3d Cir.1984), and the "unavailability rule," derived from *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), in support of his claim that, as a condition to admission of an out-of-court statement, the State must show the declarant's unavailability.

The petitioner's reliance on the Court of Appeals' decision in *Inadi* is no longer valid after the Supreme Court's decision in *United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986), reversing the finding made by the Third Circuit.

The Supreme Court held, in *Inadi*, that the Confrontation Clause does not require a showing of unavailability as a condition to admission of the out-of-court statements of a non-testifying co-conspirator. A distinction is drawn between the validity of the "unavailability rule" in cases involving prior testimony, as in *Ohio v. Roberts*, and cases involving the out-of-court statements of a co-conspirator. *Inadi*, at ——, 106 S.Ct. at 1126.

*Ohio v. Roberts*, which reaffirmed a longstanding rule that applies unavailability analysis to the prior testimony of a witness not produced at trial, cannot fairly be read to stand for the proposition that no out-of-court statements can be introduced by the prosecution without a showing that the declarant is unavailable. *Roberts* does not stand for such a "wholesale revision of the law of evidence." *Id.*, at ——, 106 S.Ct. at 1125.

Rather, "the Confrontation Clause analysis in *Roberts* focuses on those factors that come into play when the prosecution seeks to admit testimony from a prior judicial proceeding in place of live testimony at trial." *Id.*

Therefore, the principle whereby prior testimony may be admitted as a substitute for live testimony only if the declarant is unavailable does not apply to co-conspirator statements.

The Court, in *Inadi*, sets out several reasons why the "unavailability rule" developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements. Out-of-court co-conspirator statements are unlike statements in those cases in which the former testimony of a witness is only a weaker substitute for live testimony. Statements of a co-conspirator, because they are made while the conspiracy is in progress, provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. *Id.*, at ——, 106 S.Ct. at 1126.

Even where a co-conspirator takes the stand, the in-court testimony he can provide will seldom reproduce a "significant portion of the evidentiary value of his statements during the course of the conspiracy." *Id.* The statements made will

often derive their significance from the circumstances in which they are made.

For the above reasons, there appears to be little benefit or support for applying the "unavailability rule" in this case. The statements made by Mr. Barcellona derive much of their value from the fact that they were made in a context very different from trial. As such, they are irreplaceable as substantive evidence.

Courts have recognized the unique character of co-conspirator out-of-court statements, and therefore have held that a showing of unavailability is not a condition to admission of these statements. Therefore, we hold that the petitioner's right to confrontation was not violated by the introduction of Mr. Barcellona's out-of-court statements.

Moreover, the unavailability of Mr. Barcellona is not truly an issue in this case since it was demonstrated that Mr. Barcellona was unavailable as a witness. Prior to trial, the petitioner's co-defendants moved to compel the State to grant immunity to Barcellona so that he could be summoned as a witness. By such an act, the defendants conceded the unavailability of Mr. Barcellona due to the privilege against self-incrimination available to him.

Finally, the petitioner was not convicted on the statements of co-conspirators alone. The statements introduced through the recordings made of Mr. Barcellona were but a small portion of the evidence presented against the petitioner. Joseph Lazaro testified that he met the petitioner and later received $5,000 from him for a bribe to Officer McDowell. Later Lazaro spoke with the petitioner and recorded that conversation. This recording demonstrates the petitioner's knowledge of the arrangement for paying Officer McDowell $10,000 for altering his report or failing to identify Mr. Lombardo in a line-up. A defendant cannot be convicted on the statements of co-conspirators alone. There must be independent evidence that a conspiracy exists and that the defendant was a participant in it before a co-conspirator's statements will be admitted under Federal Rule of Evidence 801(d)(2)(E).

Therefore, we find the introduction of Mr. Barcellona's out-of-court statements were not in violation of the Sixth Amendment right to confrontation. In addition, we find the statements of the co-conspirators were not the sole reason for the petitioner's conviction. Rather, these statements were but a small part of the evidence presented against the petitioner. As such, we find the introduction of Mr. Barcellona's statements was appropriate.

The petitioner alleges that the sentence imposed for his convictions on conspiracy and bribery charges is manifestly excessive in comparison to the sentence imposed on the other co-defendants.

██ Sentencing is a matter of state criminal procedure and it does not involve such a denial of fundamental fairness as to fall within the purview of federal habeas corpus. *Cole v. Wyrick*, 615 F.2d 1206, 1208 n. 5 (8th Cir.1980); *Johnson v. Beto*, 383 F.2d 197, 198 (5th Cir.1967), *cert. denied*, 393 U.S. 868 (1968).

██ The standard of review for sentences imposed by state courts is limited. So long as the type of punishment is not based upon any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern. *Makal v. State of Arizona*, 544 F.2d 1030, 1035 (9th Cir.1976), *cert. denied*, 430 U.S. 936, 97 S.Ct. 1563, 51 L.Ed.2d 782 (1977).

██ The petitioner was convicted of paying a bribe to a New Jersey State trooper in exchange for the officer's agreement to alter his police report or to fail to identify the defendant in a line-up. The purpose of the bribe was to assure that Philip Lombardo, Jr. could avoid prosecution.

The facts of this case indicate that Mr. Grecco initiated the idea of offering the money to Officer McDowell. The petitioner undertook these acts in order to undermine the integrity of the judicial system and benefit another. He was not motivated because of personal jeopardy or jeopar-

dy facing a family member. These facts may all be considered in sentencing.

In the present case, the sentence imposed was clearly within the range of the trial court's discretion. N.J.S.A. 2C:44–1(a) and (b) requires the sentencing judge to consider both the aggravating and mitigating criteria when setting a sentence. N.J.S.A. 2C:44–1(d) establishes a presumption of imprisonment for those convicted of first and second degree crimes. Judge Huber clearly considered each of these factors before imposing sentence.

The court noted that the defendant was a first offender. The court looked at the totality of the circumstances, including the petitioner's background and family life, the nature and circumstances of the offenses and the information contained in the pre-sentence report.

Upon an appraisal of all the circumstances, Judge Huber found that the aggravating factors clearly outweighed the mitigating factors and for this reason felt it necessary to impose a custodial sentence. The nature and circumstances of the offense, N.J.S.A. 2C:44–1(a)(1); the risk of petitioner's committing another offense, N.J.S.A. 2C:44–1(a)(3); the fact that a lesser sentence would deprecate the seriousness of the offense, N.J.S.A. 2C:44–1(a)(4); and the likelihood that the petitioner was involved in organized criminal activity, N.J.S.A. 2C:44–1(a)(9) were all found to outweigh the mitigating factors. For this reason, the court felt the conviction required the imposition of the presumptive custodial term, N.J.S.A. 2C:44–1(d), for the petitioner's second degree offense.

For all of the above reasons, Judge Huber was convinced a suspended sentence would not be appropriate in the case of the petitioner. All of these considerations made by Judge Huber were clearly within the discretion of the trial court judge. As such, the sentence imposed on Mr. Grecco was within the statutory bounds and not manifestly excessive either in itself or compared to the sentence imposed on the other co-defendants.

■ The petitioner claims that his sentence was excessive in comparison with the sentences received by the others involved in the same criminal scheme. The fact that the others were acquitted can have no bearing upon the petitioner's claim that his sentence was manifestly excessive. Mr. Barcellona's sentence was the product of a plea agreement with the State and Mr. Conway was convicted of a different substantive count. Thus, the sentence imposed on the other co-conspirators cannot be compared to the petitioner's sentence nor can they undermine the fairness of the sentence received by the petitioner. *See State v. Hicks*, 54 N.J. 390, 255 A.2d 264 (1969).

The petitioner's sentence was a proper exercise of the trial court's discretion and cannot be considered excessive. The petitioner, therefore, has failed to state a constitutional claim upon which relief can be granted and federal habeas corpus relief is unwarranted.

## CONCLUSION

Petitioner's application for writ of habeas corpus is denied. Petitioner has failed to demonstrate that he is in custody in violation of 28 U.S.C. § 2254.