587 So.2d 1175 (1991)
Mario KRAJEWSKI, Appellant,
v.
STATE of Florida, Appellee.
No. 90-0703.
District Court of Appeal of Florida, Fourth District.
March 13, 1991.
*1176 Richard L. Jorandby, Public Defender, and Tanja Ostapoff, Asst. Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Joseph A. Tringali, Asst. Atty. Gen., West Palm Beach, for appellee.
HERSEY, Chief Judge.
Mario Krajewski appeals his conviction and sentence for possession of more than 400 grams of cocaine and for conspiring to buy more than 400 grams of cocaine. The issue on appeal involves various aspects of entrapment and related defenses.
The facts are in dispute. Appellant's version of the facts is that his mother gave him $13,000 (or $14,000) to buy a boat. He came to Florida with Robert Poidomani, his codefendant, for the express purpose of making such a purchase. They contacted Vern Phinney, a boat repair specialist, who was also known to be a drug dealer and, as it turned out in this case, was a police informer. They began to discuss boats, but Phinney suggested that they engage in the cocaine market. Appellant later testified that this suggestion "irritated" him and he told Phinney that his "main interest was to buy a boat and not to engage in that market." As a matter of fact appellant never looked at any boats. Eventually, appellant agreed to use the money to purchase cocaine "under pressure" exerted by Phinney. Appellant testified that he only agreed to the deal after Phinney pointed a gun at him and said that the deal had to go through because he was receiving pressure from the people with whom he was dealing. Poidomani indicated that Phinney had also pulled a gun on him. As a result, a drug purchase was arranged with an undercover police officer resulting in the arrest and subsequent convictions of appellant and Poidomani.
At a hearing on a motion to dismiss, Poidomani testified substantially in accordance *1177 with the foregoing recitation. At trial, however, he testified that he and appellant came to Florida to purchase cocaine and that he had never heard anything about buying a boat until after his arrest. Poidomani's sentence was reduced from a possible 15 to 30 year mandatory minimum to a 7 1/2 year prison term in exchange for his testimony.
Phinney, the informant, had been trying to give substantial assistance to the federal authorities in exchange for a reduction of his sentence for attempting to smuggle marijuana into this country from the Bahamas. Because Phinney's sentencing date was approaching rapidly, and because he realized that the federal authorities were not inclined to move for any reduction of his sentence, Phinney admitted that he was "fairly upset that something might not happen." Phinney's sentencing was less than a month away when he contacted the undercover police officer.
While Phinney apparently did not have any written agreement with an agency of the federal government, he testified that he did have an agreement with the Broward Sheriff's Office. He further testified that he was totally unsupervised by the government and was working independently to set up drug deals. More specifically, the United States government and the Broward Sheriff's Office told him to "go ahead out any time you want, meet anywhere with anyone, set up anything you want and then when you got it set up you come back and let us know." He had also been told by the government prosecutor that if he did not provide substantial assistance, he would be sentenced in accordance with his conviction. Phinney's testimony was the state's primary evidence to rebut appellant's entrapment defense.
As in all such cases, there are substantial issues of credibility surrounding the testimony in this case. That is one of the dangerous side effects of rewarding informants for making cases and giving them unfettered freedom to do so. Such issues must be considered on a case-by-case basis; however, in the extreme case these credibility issues will become inconsequential. The factual guilt of the accused will be excused because of the prior deprivation of his right to due process of law.
Appellant postulates on appeal that the jury instructions erroneously shifted to him the burden of proving his innocence, and that the trial court erred in denying his motion to dismiss where he had been entrapped as a matter of law. Implicit in these arguments is the notion that appellant was deprived of due process.

The Entrapment Defense
Prior to the enactment in 1987 of the entrapment statute, section 777.201, Florida Statutes, the leading case on the law of entrapment was Cruz v. State, 465 So.2d 516 (Fla.), cert. denied, 473 U.S. 905, 105 S.Ct. 3527, 87 L.Ed.2d 652 (1985). In that case our supreme court pointed out that: "The entrapment defense arises from a recognition that sometimes police activity will induce an otherwise innocent individual to commit the criminal act the police activity seeks to produce." Id. at 517. The court concluded that the entrapment defense focuses primarily on the predisposition of the defendant. Thus, the test of whether or not entrapment has occurred is a subjective one, depending upon whether the defendant was predisposed to commit the crime of which he stands accused. Explaining another aspect of the entrapment defense, the Cruz court stated: "The subjective view recognizes that innocent, unpredisposed persons will sometimes be ensnared by otherwise permissible police behavior. However, there are times when police resort to impermissible techniques. In those cases, the subjective view allows conviction of predisposed defendants. The objective view requires that all persons so ensnared be released." Id. at 520.
Rejecting the federal view that the subjective and objective tests are mutually exclusive, the court fashioned a two-part test embodying both:
We find ... that the subjective and objective entrapment doctrines can coexist. The subjective test is normally a jury question. The objective test is a matter of law for the trial court to decide.

*1178 The effect of a threshold objective test is to require the state to establish initially whether "police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." Sherman [v. U.S.], 356 U.S. 369 at 382, 78 S.Ct. [819] at 825 [2 L.Ed.2d 848 (1958)] (Frankfurter, J., concurring in the result). Once the state has established the validity of the police activity, the question remains whether "the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute." Sorrells [v. U.S.], 287 U.S. 435 at 442, 53 S.Ct. [210] at 212 [77 L.Ed. 413] (1932). This question is answered by deciding whether the defendant was predisposed, and is properly for the jury to decide. In other words, the court must first decide whether the police have cast their nets in permissible waters, and, if so, the jury must decide whether the particular defendant was one of the guilty the police may permissibly ensnare.
Id. at 521-522.
In 1987, the legislature enacted the entrapment statute. It reads as follows:
1) A law enforcement officer, a person engaged in cooperation with a law enforcement officer, or a person acting as an agent of a law enforcement officer perpetrates an entrapment if, for the purpose of obtaining evidence of the commission of a crime, he induces or encourages and, as a direct result, causes another person to engage in conduct constituting such crime by employing methods of persuasion or inducement which create a substantial risk that such crime will be committed by a person other than one who is ready to commit it.
(2) A person prosecuted for a crime shall be acquitted if he proves by a preponderance of the evidence that his criminal conduct occurred as a result of an entrapment. The issue of entrapment shall be tried by the trier of fact.
§ 777.201, Fla. Stat. (1987).
The third district construes the new statute as eliminating the objective test of Cruz, leaving only the subjective test for determination by the jury. Gonzalez v. State, 571 So.2d 1346 (Fla. 3d DCA 1990).
The second district, on the other hand, interprets the amendment as leaving both the objective and the subjective aspects of the entrapment defense intact. Bowser v. State, 555 So.2d 879 (Fla. 2d DCA 1989).
Recent cases out of this court involving entrapment thus far have not been squarely presented with this question. Londono v. State, 565 So.2d 1365 (Fla. 4th DCA 1990); State v. Burch, 545 So.2d 279 (Fla. 4th DCA 1989), approved, 558 So.2d 1 (Fla. 1990); State v. Anders, 560 So.2d 288 (Fla. 4th DCA 1990); State v. Maugeri, 570 So.2d 1153 (Fla. 4th DCA 1990); Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988). It is, in fact, only peripherally relevant in the present case. We nonetheless address the issue briefly.
We align this court with the view expressed by the third district in Gonzalez. We are persuaded to this view not only by the reasoning of that opinion but also by the language of the new statute. Critical to our analysis and interpretation is the use by the legislature of the term "cause." The objective test is not concerned with cause and effect. It examines only the action of law enforcement or its agencies, and whether that action is permissible rather than "outrageous." On the other hand, the statute is concerned with whether law enforcement activity causes a person to commit a crime. This is entirely a subjective matter.

Burden of Proof
As we construe the statute, the requirement that a defendant must prove by a preponderance of the evidence that his criminal conduct occurred as a result of an entrapment does not implicate any constitutional prohibitions. The state must prove, beyond a reasonable doubt, all of the elements of the crime charged. This initial burden is not shifted by the statute. As *1179 conceded by appellant, due process is not offended by imposing the burden of proving an affirmative defense upon the defendant once the state has met its initial burden. Martin v. Ohio, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987); see also Simopoulos v. Virginia, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983); Patterson v. New York, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). On the other hand, if the statute were applied in a particular case in such a way as to shift to the defendant the burden of disproving one of the elements of the crime charged, then this would run afoul of constitutional safeguards. Mullaney v. Wilbur, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

Jury Instructions
In order to chart a course between permissible burden of proof allocation and impermissible burden shifting, the jury must receive adequate instruction. The court first must instruct the jury that all of the evidence, including evidence bearing on the defense of entrapment, must be considered in measuring whether the state has met its initial burden of proving all of the elements of the crime beyond a reasonable doubt. Only after making this determination should the jury consider whether the defendant has proven entrapment by a preponderance of the evidence.
In this case the jury was charged, inter alia:
The defendant has entered a plea of not guilty. This means you must presume or believe the defendant is innocent. The presumption stays with the defendant as to each material allegation in the Information through each  stage of the trial until it has been overcome by the evidence to the exclusion of and beyond a reasonable doubt.
To overcome the defendant's presumption of innocence the State has the burden of proving the following two elements:
One, the crime with which the defendant is charged was committed.
And two, the defendant is the person who committed the crime.
The defendant is not required to prove anything.
Whenever the words reasonable doubt are used you must consider the following:
A reasonable doubt is not a possible doubt, a speculative, imaginary or a forced doubt. Such a doubt must not influence you to return a verdict of not guilty if you have an abiding conviction of guilt. On the other hand, if, after carefully considering, comparing and weighing all of the evidence, there is not an abiding conviction of guilty, or, if, having a conviction, it is one which is not stable but one which wavers and vacilates, then the charge is not proved beyond every reasonable doubt and you must find the defendant not guilty because the doubt is reasonable.
It is the evidence introduced upon this trial, and to it alone, that you are to look for that proof.
A reasonable doubt as to the guilt of the defendant may arise from the evidence, conflict in the evidence or the lack of evidence.
If you have a reasonable doubt, you should find the defendant not guilty. If you have no reasonable doubt, you should find the defendant guilty.
On the defense of entrapment, the jury was instructed:
The defense of entrapment has been raised. Mario Krajewski was entrapped if:
He was, for the purpose of obtaining evidence of the commission of a crime, induced or encouraged to engage in conduct constituting the crime of conspiracy to traffic in cocaine or trafficking in cocaine, and
He engaged in such conduct as the direct result of such inducement or encouragement, and
The person who induced or encouraged him was a law enforcement officer or a person engaged in cooperating with or acting as an agent of a law enforcement officer, and
The person who induced or encouraged him employed methods of persuasion or *1180 inducement which created a substantial risk that the crime would be committed by a person other than one who was ready to commit it, and
Mario Krajewski was not a person who was ready to commit the crime.
It is not entrapment if Mario Krajewski had the predisposition to commit the crimes charged. Mario Krajewski had the predisposition if before any law enforcement officer or person acting for the officer persuaded, induced, or lured Mario Krajewski, he had a readiness or willingness to commit the crimes charged if the opportunity presented itself.
It is also not entrapment merely because a law enforcement officer in a good faith attempt to detect crime:
Provided the defendant the opportunity, means and facilities to commit the offense, which the defendant intended to commit and would have committed otherwise.
Or used tricks, decoys or subterfuge to expose the defendant's criminal act.
Or, was present and pretended to aid or assist in the commission of the offense.
On the issue of entrapment, the defendant must prove to you by the preponderance of the evidence that his criminal conduct occurred as the result of entrapment.
Appellant raises the propriety of these instructions as a point on appeal.
At trial appellant requested the trial court to give the following instruction: "Once evidence is introduced which suggests the possibility of entrapment, the State has the burden of proving beyond and to the exclusion of every reasonable doubt that the Defendant was not entrapped." Not only is this instruction an incorrect statement of the law, but it also has no bearing on the issue now presented for our consideration. Appellant argues here that the jury instructions were erroneous for failure to require that the jury look at all the evidence, including evidence presented by appellant concerning his defense, in its determination of whether the state proved its case beyond a reasonable doubt. No such objection was made to the trial court and the proffered instruction neither expressly nor by implication suggests this particular inadequacy. Thus any supposed defect is waived. See Courson v. State, 414 So.2d 207, 209 (Fla. 3d DCA 1982). Even if it had not been waived, however, we find the jury instructions adequate as a whole to convey the requirement that the jury must consider all the evidence in determining whether the state met its burden of proof.

Due Process: Application
The due process clauses of both the federal and Florida constitutions have been interpreted by the courts as placing certain limitations on the methods which may be employed by law enforcement agencies in conducting the war against crime. Whether a particular practice constitutes deprivation of due process is ordinarily a matter of law for the court to decide. United States v. Graves, 556 F.2d 1319 (5th Cir.1977), cert. denied, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978). Appellant presents such a due process argument here.
In State v. Glosson, 462 So.2d 1082 (Fla. 1985), our supreme court established some parameters for consideration of the due process defense in the context of an entrapment situation. In that case, the Levy County Sheriff's department had entered into an agreement with an informant, Wilson, to pay him ten percent of all civil forfeitures arising out of successful criminal prosecutions he completed in Levy County. The agreement also required Wilson to testify in any prosecutions resulting from his activities. Wilson went to Dade County where he enticed the defendant to engage in a drug transaction (actually a reverse sting) in Levy County. Undisputably, the state attorney's office knew about "and even supervised Wilson's investigations... ." Id. at 1083.
On its way to finding a due process violation the court stated:
We reject the narrow application of the due process defense found in the federal cases. Based upon the due process provision of article I, section 9 of the Florida Constitution, we agree with [two cases *1181 from foreign jurisdictions] that governmental misconduct which violates the constitutional due process right of a defendant, regardless of that defendant's predisposition, requires the dismissal of criminal charges.
.....
Accordingly, we hold that a trial court may properly dismiss criminal charges for constitutional due process violations in cases where an informant stands to gain a contingent fee conditioned on cooperation and testimony in the criminal prosecution when that testimony is critical to a successful prosecution. We approve the district court decision under review.
Id. at 1085.
This court, in Hunter v. State, 531 So.2d 239 (Fla. 4th DCA 1988), had occasion to apply the Glosson due process analysis. Rather than receiving a contingent fee for making drug deals and testifying, the informant in Hunter was to be rewarded by a reduction in his own sentence. We concluded that this difference did not constitute a basis for making a legal distinction, although we certified the question to the supreme court.
In State v. Burch, 545 So.2d 279 (Fla. 4th DCA 1989), we again confronted an entrapment defense and a due process argument, but rejected both.
Then, in State v. Anders, 560 So.2d 288 (Fla. 4th DCA 1990), we again applied Glosson, found a due process violation, affirmed dismissal of the charges and again certified the question to our supreme court. See also State v. Maugeri, 570 So.2d 1153 (Fla. 4th DCA 1990) (affirming on the authority of Anders without discussion of the facts, and certifying the question).

Due Process: Analysis
The first paragraph of the entrapment statute is framed in terms of an entrapment offense which under certain circumstances may be committed by law enforcement agents, sometimes in conjunction with those involved with the prosecution. An informer is often a player in the scenario. A second aspect of the statute defines its defensive role and this section is cast in terms of one being entrapped by those committing an entrapment. In combination, these aspects are said to result in a defense the availability of which is to be tested subjectively. Thus, the predisposition of the accused is relevant and the issue is whether the activity alleged to constitute entrapment caused the accused to commit the crime in view of that predisposition.
On the other hand, the availability of the defense of due process results from the application of an objective test. That is, the test of whether or not the accused has been deprived of his right to due process depends not at all on the nature or gravity of the offense, the state of mind of the accused, or any other subjective element. We look only to the activity of law enforcement and, sometimes, the prosecution, to determine whether that activity is outrageous or shocking or "uncivilized." If it is, then the crime is forgiven and the accused is discharged.
Characterizing the test for deprivation of due process as an objective one is accurate as long as we are clear that what we really mean is that (1) the activity we put on the scale relates only to law enforcement and not at all to the crime or the criminal, and (2) the issue is one of law for the court rather than one of fact for the fact finder.
We acknowledge, at the same time, that a test is purely objective only where bright line standards exist to permit an empirical evaluation of factors to be made with reasonably certain and predictable results. This is not yet true of the due process defense. To the extent that the availability of the defense rests upon the judicial (and personal) philosophy of the trial court, three appellate judges and seven supreme court justices, it remains subjective in that context. Because this is so, we turn again to Glosson, Hunter, and Anders to seek a least common denominator to guide our application vel non of the defense here.
Glosson looks to the Florida rather than the federal constitution in framing a due process defense which then becomes an objective question of law for the trial court. The significant factors giving rise to the *1182 defense in Glosson are: (1) a contingent fee to the informant consisting of ten per cent of civil forfeitures; (2) that fee's arising out of successful criminal prosecutions obtained through the cooperation of the informant; (3) the informant's testimony is vital to those convictions; and (4) the informant's activities were supervised by the state attorney's office. This combination of factors is said to violate "the constitutional due process right of a defendant, regardless of that defendant's predisposition," requiring dismissal of criminal charges. Glosson, 462 So.2d at 1085. The public policy requiring this result is said to be that "[t]he due process rights of all citizens require us to forbid criminal prosecutions based upon the testimony of vital state witnesses who have what amounts to a financial stake in criminal convictions." Id. at 1085. If we stop here, it appears that only two of the four elements formerly identified are really significant to an analysis of the due process defense: (1) some kind of financial stake; (2) held by a vital state witness. The supreme court emphasizes the enormous potential for abuse which exists when an informant has a financial incentive to make criminal cases and in the process to commit perjury. Seeming to narrow the foregoing in some respects and to broaden it in others, the Glosson opinion concludes:
Accordingly, we hold that a trial court may properly dismiss criminal charges for constitutional due process violations in cases where an informant stands to gain a contingent fee conditioned on cooperation and testimony in the criminal prosecution when that testimony is critical to a successful prosecution. We approve the district court decision under review.
Id.
Summarizing our analysis, it appears first that supervision of the informant's activities by the state's attorney's office became a non factor in the ultimate rationale of Glosson. The remaining and critical elements are the contingent fee earned by cooperation, and the giving of testimony which was critical to a successful prosecution.
We turn next to Hunter v. State, 531 So.2d 239, this court's first extension of the Glosson due process defense. In Hunter the informant entered into an agreement to make new drug cases in exchange for which his prison sentence would be reduced considerably, and a mandatory fine of $250,000 would be vacated. In a sense this was a contingent fee in an all or nothing context. We pointed out that "[a]s in Glosson, the informant here had an invaluable stake in making new cases: his own freedom." Hunter, 531 So.2d at 242. Also as in Glosson, the informant was free to set up transactions where and when he chose, being authorized to do so by "judicial, prosecutorial, and law enforcement" personnel. Id. Further, he was the state's key witness.
In essence, then, while some of the emphasis in Hunter was different from that in Glosson, the basic elements were similar: (1) a contingent financial interest (as well as a freedom interest) held by (2) an informant acting under the aegis of state agencies (3) cooperating with those agencies to make new drug transactions and (4) whose testimony is vital to the prosecution.
While in Hunter we discussed a variance between the statutory authorization for substantial assistance agreements and the actual agreement in that case, we later substantially retreated from any meaningful reliance on that variance in State v. Anders, 560 So.2d 288, which followed an amendment of the statute. It is in fact rendered moot, in this context, by the amendment to the statute, section 893.135(3), Florida Statutes (1985).
We next visit Anders for a brief comparison. In Anders, the trial court found the facts more compelling than Hunter for application of the due process defense because (1) a reverse sting was involved so the defendants did not have to produce drugs; (2) the transaction was not recorded; (3) nor was it supervised or assisted; (4) the informer had complete freedom to create any type of drug deal at any time and in any manner; and (5) he was the only state witness. We affirmed the trial *1183 court's dismissal, finding that the activity occasioned by the informer's performance of a substantial assistance agreement resulting in avoidance of a minimum mandatory prison term violated appellant's due process rights.
In Jamarillo v. State, 576 So.2d 349 (Fla. 4th DCA 1991), and in Khelifi v. State, 560 So.2d 333 (Fla. 4th DCA 1990), this court distinguished Anders and Hunter on the ground that there was no violation of due process where the informant's testimony was not a vital part of the state's case. The Jamarillo and the Khelifi opinions are not controlling in the present case, however, because here the informant's testimony was the state's primary evidence presented to rebut appellant's entrapment defense.
It seems to us that the essential issues which must be resolved if there is to be any predictability to the application of the due process defense are the following.
First, is it enough, standing alone, that an informant acting under state authority creates a new criminal transaction, to require the discharge on due process grounds of one ensnared by that transaction?
Second, if that is not enough, then does the fact that the informer is the state's sole witness in the case make a substantial difference? If so, would the result be different if there is other corroborating evidence?
Third, does it matter whether the informant is promised, in exchange for his cooperation and testimony, a contingent fee based upon a percentage of civil forfeitures? a set but contingent fee? forgiveness of a fine? or simply a reduction in time to be served in prison?
Without resorting to dicta, which we decline to do, we cannot answer all of these questions in the present case. However, because informers frequently put their lives on the line to make these cases, and because law enforcement personnel and trial judges need to know the answers, the former before the fact and the latter after, we make the following observations before concluding.
The nature of a due process argument is that state activity has been outrageous and perhaps could be characterized as uncivilized. If reasonable people could differ on whether a particular set of circumstances constitutes a deprivation of due process, then it hardly seems appropriate to characterize the activity as outrageous.
We are bound to follow Glosson. Civil forfeiture itself probably approaches the outer limits of due process. Using a contingent fee based upon civil forfeitures as a reward for making a crime where none existed before could logically be characterized as passing the outer limits of due process. Assuming, without knowing for certain, that the forfeited contraband belonged to the individual ensnared by the informant in the previously nonexistent criminal activity, it would be ironic (perhaps unjust is a more appropriate term) for the informant to be paid from property which the informant induced the now-criminal defendant to put at jeopardy in the first instance. This assumes, of course, state complicity.
The same reasoning does not extend beyond Glosson to Hunter and Anders and similar cases. Nothing of monetary value has been taken from the defendants to reward the informer. The financial stake, if any, that the informer has in the case does not deprive the ensnared defendant of anything.
In the present case the informer was free to develop new drug transactions for which he was to receive a reduction in his sentence. While we do not think Glosson compels a finding of a due process violation under these circumstances, Hunter and Anders obviously do.
As explained in Anders, the substantial assistance statute, section 893.135(4), Florida Statutes (1989), was amended after Hunter, but, given the constitutional underpinnings of the due process defense in the context of these cases, the amendment has no effect on our consideration.
Based upon Glosson, as extended by Hunter and Anders, we conclude that appellant's right to due process was violated, and we reverse and remand with instructions *1184 to dismiss the charges and to discharge appellant.
As in previous cases, we certify the following slightly altered question to the supreme court:
DOES THE PERFORMANCE OF AN AGREEMENT UNDER SECTION 893.135(4) AS AMENDED, WHEREBY AN INFORMER WILL RECEIVE A SUBSTANTIALLY REDUCED SENTENCE IN EXCHANGE FOR SETTING UP NEW DRUG DEALS AND TESTIFYING, CONSTITUTE A PER SE VIOLATION OF THE HOLDING IN STATE v. GLOSSON, 462 So.2d 1082 (Fla. 1985) AS TO AN INDIVIDUAL ENSNARED BY THAT PERFORMANCE?
If this question is answered in the affirmative, it is difficult for us to envision a substantial assistance agreement involving drug dealers that would pass constitutional muster. The statute is to this extent substantially emasculated, and particularly the amended portion. Because the perceived defect is of constitutional dimension there is little the legislature can do to restore this weapon to the arsenal of law enforcement. In view of these consequences, and but for Hunter, Anders, and Maugeri, which are now the law of this district, we would suggest that there is a material difference between a contingent-fee arrangement based upon civil forfeitures (given that the concept of civil forfeitures strains against due process concerns in the first instance) and a simple agreement for a reduced sentence for cooperation, with the added proviso that the informant be monitored to eliminate or at least to minimize the possibility of manufactured testimony and perhaps with the additional caveat that there be a sufficient quantum of corroborating evidence. Our own precedents preclude us from so concluding here.
REVERSED WITH INSTRUCTIONS AND QUESTION CERTIFIED.
DOWNEY, J., and WALDEN, JAMES H. (Retired), Associate Judge, concur.